Roderick M. Thompson (State Bar No. 96192)
  rthompson@fbm.com
Gary M. Kaplan (State Bar No. 155530)
  gkaplan@fbm.com
Eugene Y. Mar (State Bar No. 227071)
  emar@fbm.com
Hilary C. Krase (State Bar No. 318762)
  hkrase@fbm.com
Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
Telephone: (415) 954-4400
Facsimile: (415) 954-4480

Attorneys for Plaintiff VISA INTERNATIONAL SERVICE ASSOCIATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISA INTERNATIONAL SERVICE ASSOCIATION,<br><br>Plaintiff,<br><br>vs.<br><br>BANKISLAMI PAKISTAN LIMITED,<br><br>Defendant. | Case No. 3:20-cv-1786<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Visa International Service Association ("Visa" or "Plaintiff") hereby submits its Complaint for Breach of Contract and Breach of Duty of Good Faith and Fair Dealing (the "Complaint") against Defendant BankIslami Pakistan Limited ("BankIslami" or "Defendant"), and in support thereof alleges as follows based on information and belief and investigation of counsel.

## THE PARTIES

1. Visa is, and at all relevant times was, a corporation in good standing incorporated under the laws of the State of Delaware and with its principal place of business in Foster City, California.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

COMPLAINT

36827\12697629.16

2. Visa is informed and believes, and on that basis alleges, that BankIslami is, and at all relevant times was, a corporation organized and existing under the laws of the nation of Pakistan and with its principal place of business in Karachi, Pakistan.

3. On information and belief, BankIslami commenced its operations in approximately April 2006. On information and belief, at the time the parties entered into that certain Membership and Trademark License Agreement on June 19, 2008 ("MTLA") (true and correct copy attached hereto as **Exhibit A** and incorporated by reference), BankIslami had approximately 36 branches in approximately 23 cities and planned to grow to a network of 100 branches by the end of 2008.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a)(2) because the controversy asserted herein is between citizens of a state and citizens or subjects of a foreign state, and involves damages in excess of $75,000, exclusive of interest and costs.

5. The Court has personal jurisdiction over Defendant by mutual consent of the parties pursuant to the MTLA and the Program Security Agreement (for Standby Letter of Credit Provided by a Member) entered into on August 4, 2008 ("PSA") (true and correct copy attached hereto as **Exhibit B** and incorporated by reference) (the MTLA and PSA are collectively referred to herein as the "Agreements"). *See* **Ex. A** ¶ 10 ("The parties hereby submit to the jurisdiction of the courts in the State of California . . ."); **Ex. B** § 11.2(a)-(b) ("(a) Member [BankIslami] irrevocably agrees that any legal action . . . in any way connected with this Agreement, any of the Regulations or any document delivered under or pursuant to this Agreement . . . may be brought in the state or federal courts of competent jurisdiction in the State of California . (b) . . . Member [BankIslami] hereby irrevocably accepts, submits and consents to the non-exclusive personal jurisdiction of the state and federal courts in the State of California with respect to any action . . . described in paragraph (a) above.").

6. Venue is proper within this District pursuant to 28 U.S.C. Section 1391(b)(2) because Visa is headquartered in this District and the payment of the approximately $6.2 million at issue emanated here. In the alternative, if Section 1391(b)(2) does not apply, venue is proper

within this District pursuant to 28 U.S.C. Section 1391(b)(3) because BankIslami is subject to the Court's personal jurisdiction.  *See* **Ex. A** ¶ 10 (BankIslami submits to jurisdiction of the courts in the State of California); **Ex. B** § 11.2(a)-(b) (same); s*ee also Id.* § 11.2(d)(iii) (stating that Member [BankIslami] "irrevocably and unconditionally waives, to the fullest extent permitted by applicable law, any objection which it may now or in the future have to the venue of any of the actions, suits or proceedings described in paragraph (a) brought in any state or federal court in the State of California"); *see also id.* § 11.2(d)(iv) (stating that Member [BankIslami] "irrevocably and unconditionally waives and agrees, to the fullest extent permitted by applicable law, not to plead or claim that any such action, suit, or proceeding brought in any such court has been brought in an inconvenient forum.").

## INTRADISTRICT ASSIGNMENT

7. This case should be assigned to the Northern District of California, San Francisco or Oakland Division because Visa is headquartered in Foster City (San Mateo County) and the payment of the approximately $6.2 million at issue emanated from there.

## NATURE OF THE CASE AND FACTUAL BACKGROUND

8. This is an action for breach of contract and breach of the duty of good faith and fair dealing under the laws of California.  Visa seeks compensatory damages, interest, attorneys' fees and costs, and such other relief as the Court deems just and proper.

**I.    THE AGREEMENTS**

9. Visa and BankIslami entered into the MTLA effective June 19, 2008, which was signed and executed by representatives of both parties with authority to bind the respective parties. Pursuant to the MTLA, BankIslami agreed to be a licensee and "member" of Visa.

10. Visa and BankIslami entered into the PSA on August 4, 2008, which was signed and executed by representatives of both parties with authority to bind the respective parties.

11. Pursuant to the Agreements, Visa accepted BankIslami as a "member" and BankIslami agreed to comply with Visa's rules and regulations, including its By-Laws and

Operating Regulations.[1]  *See* **Ex. A ¶** 6; *see also* **Ex. B** at pp. 3-4.  Visa's rules and regulations are expressly incorporated by reference in the Agreements, and include, *inter alia,* the Visa Core Rules and Visa Product and Service Rules (collectively, the "Visa Rules").

12. The Visa Rules provide, in relevant part:

> If a Member or VisaNet Processor wishes to dispute an amount collected by Visa, it must both:
>
> - Provide written notice to Visa within 60 calendar days of the collection date, if it wishes to dispute its liability for or the amount of the collection
>
> - **Not withhold payment because the Member or VisaNet Processor disputes its liability for the payment**

*See* Excerpt from Visa Rules, 13 October 2018 (true and correct copy attached hereto as **Exhibit C** and incorporated by reference) § 10.2.1.12 (emphasis added).

13. The Visa Rules provide, in relevant part that "[e]ach Member is solely responsible for its issuance of Visa products and acquiring of Merchants to accept Visa products, including responsibility for settlement of Transactions, compliance with the Visa Charter Documents and the *Visa Core Rules and Visa Product and Service Rules*, and ensuring that their Visa programs comply with all applicable legal and regulatory requirements."  *See* **Ex. C** § 1.1.9.1.  Furthermore, the Visa Rules require each Member to indemnify Visa for and against claims and liabilities arising out of or related to the issuance of Visa products and acquiring of Merchants, as well as to disclaim any liability against Visa for such activities.  *Id.*

14. The Visa Rules also provide: "Upon submission of a Clearing Record to VisaNet, a Member must be ready to settle the Transaction within the timeframe specified by Visa for the applicable settlement service and Settlement Currency."  *See* **Ex. C** § 7.8.7.1.

15. The PSA provides that the prevailing party in a dispute shall be entitled to recover its attorneys' fees and costs.  **Ex. B** § 11.3.

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in the Agreements.

## II. VISA SETTLEMENT PROCESS

16. When a cardholder purchases an item with a Visa payment card, the merchant's point of sale device automatically checks to verify that the issuing bank approves the transaction. This request is transmitted by the merchant's bank (the "merchant" or "acquirer" bank) through the VisaNet[2] system to the issuer bank for approval.

17. Once such approval is received, the merchant completes the transaction and the merchant bank then credits the merchant's account. Through VisaNet, the merchant and issuer banks settle the transactions and the merchant bank is credited for the transaction.

18. Pursuant to the Agreements, BankIslami, a financial institution and Visa member, issues Visa payment cards (credit and debit cards) to individual cardholders for use in transactions. In this role, BankIslami is referred to as the "issuing" or "issuer" bank.

19. When a cardholder attempts a cash withdrawal from a non-BankIslami automated teller machine ("**ATM**") with a BankIslami issued Visa payment card, the acquirer (the bank from which the cardholder is attempting the transaction) submits the transaction to VisaNet. VisaNet forwards that authorization request to 1Link as the issuer processor for BankIslami (the issuing bank) for issuer authorization. When the issuing bank makes a decision to approve or decline the transaction, that decision is sent from the issuing bank to 1Link. 1Link then sends the response to Visa. Visa, in turn, sends the response to the acquirer, who disburses the amount authorized to be withdrawn pursuant to an issuing bank's authorization.

20. Visa performs the settlement of the transaction such that the settlement account of the ATM bank (the acquirer) is credited for the amount withdrawn with a corresponding debit to BankIslami's settlement account. VisaNet does not facilitate the transfer of funds between banks after each transaction. Rather it receives remittances for the total approved transactions that occur

---

[2] VisaNet is Visa's transaction processing network. It facilitates authorization, clearing and settlement of payment transactions. In general, authorization is the process of approving or declining a transaction by an issuer before cash is disbursed; clearing is the process of delivering final transaction data from Visa acquirers to Visa issuers for posting to the cardholder's account, currency conversion and transaction fee calculation; and settlement is the process of calculating and reporting the net financial positions of Visa's issuers and acquirers for all transactions that are cleared.

each business day, and at the conclusion of each business day, it nets the aggregate debits and credits and "settles" its member banks' accounts.  This "settlement process" does not occur on non-business days.  Rather, transactions that occur during weekend and other nonbusiness days are settled at the end of the next business day (typically, on Monday for transactions during the prior weekend).

21. BankIslami maintains a settlement account with Faysal Bank Limited ("**Faysal Bank**") for VisaNet to pay or settle BankIslami transactions.  Faysal Bank, in turn, funds an account maintained with a U.S. financial institution in a sufficient amount for settlement with applicable acquiring banks.  When BankIslami is in a net debit position, then funds are requested via the Visa settlement process from Faysal Bank and transferred or paid through VisaNet at the end of the business day.

22. Thus, funds are not paid directly by BankIslami to Visa, but rather funds are transferred from the BankIslami settlement account with Faysal Bank to settle such transactions.

### III. ATM CASHOUT

23. On Saturday, October 27, 2018, BankIslami experienced a "cashout ATM attack." An ATM cash-out attack often results from a breach to the issuer back-end systems and system parameters, which attackers manipulate to increase card balances, reset PINs and transaction limits for selected cardholder accounts, and/or remotely control the ATMs themselves.  Attackers then use the breached cardholder data to produce counterfeit magnetic-stripe cards and withdraw significant amounts of cash from ATMs across the globe within a few hours

24. Upon information and belief, at this time, BankIslami was not in full compliance with payment industry card security standards at the time of the ATM cashout.  BankIslami's magnetic stripe cards were breached in this incident and its core banking system was compromised.  Furthermore, upon information and belief, many of BankIslami's systems were compromised by malware and determined to be a source of or in some way linked to the spread of malware.

25. Pursuant to Visa Rules and other applicable contractual commitments between the parties, it is the issuer bank's (here BankIslami) responsibility to implement appropriate

authorization and fraud prevention decisions concerning transactions that may be suspicious, as issuers are best positioned to make such decisions based on their particular cardholder's transaction history, withdrawal limits, bank balance, and profile.  Nonetheless, BankIslami was alerted by Visa of information that an ATM cashout was likely before it occurred.  Further, Visa altered BankIslami while the cashout was in progress and BankIslami eventually acted and declined ATM withdrawals.

26. Upon information and belief, during the incident window, over 3,000 unique BankIslami primary account numbers were used to make over 5,000 ATM magnetic stripe transactions for a total of approximately USD $6,122,173 across over 160 acquirers in approximately 30 countries.

27. The following day, Sunday, October 28, 2018, the State Bank of Pakistan issued a directive to all banks in Pakistan.  The directive concerned the security breach of payment cards.  It instructed all banks to take security measures on IT systems, deploy resources relating to monitoring of cards, and coordinate with all payment schemes, switch operators, and media service providers with which the banks were integrated to identify suspicious activity.  *See* "SBP issues directives to banks on security breach of payment cards" (Oct. 28, 2018), *available at* http://www.sbp.org.pk/press/2018/Pr-CardsSecurity-28-Oct-18.pdf (true and correct copy attached hereto as **Exhibit D** and incorporated by reference).

28. On Monday, October 29, 2018, BankIslami transmitted a letter to the Pakistan Stock Exchange in which BankIslami acknowledged that abnormal transactions were detected and recognized the approximately $6 million at issue in this Complaint.

29. That same day, BankIslami posted the letter to the Pakistan Stock Exchange Limited on Twitter.

IV. **BANKISLAMI'S FAILURE TO PAY**

30. Following the ATM cashout, Visa was ready to deduct approximately $6,122,173.00 from BankIslami's settlement account with Faysal Bank on Monday, October 29, 2018 pursuant to routine settlement procedures.  But for actions taken by BankIslami, Visa would have completed this transaction.

31. BankIslami knowingly and deliberately prevented the transfer of these funds. Subsequently, additional amounts subject to the ATM cashout were identified bringing the total to approximately $6,207,960.59. Visa, in order to ensure ecosystem stability and stakeholder trust, was forced to pay approximately $6,207,960.59 of its own funds to complete settlement for the various acquirer banks whose ATM machines were used to withdraw the funds in the cashout. To date, BankIslami has not reimbursed Visa for any of this expenditure despite repeated demands.

32. Instead, on information and belief, prior to the time that it knew the required settlement transaction would occur (Monday), BankIslami took deliberate actions to prevent settlement and the payment of approximately $6,207,960.59 from its Faysal Bank account to Visa. Pursuant to the Agreements, BankIslami was prohibited from withholding this payment even if it disputed its liability, and was required to follow specific procedures to resolve such a dispute. However, BankIslami took action to withhold the payment to Visa in direct violation of the Agreements to "**[n]ot withhold payment because the Member or VisaNet Processor disputes its liability for the payment.**" *See* **Ex. C** § 10.2.1.12 (emphasis added).

33. To this day, despite numerous demands by Visa, none of the approximately $6,207,960.59 has been remitted to Visa.[3] Nor has BankIslami paid the approximately $7,309,562.00 in assessments imposed on BankIslami due to their refusal to permit settlement.[4]

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

34. Visa repeats, re-alleges, and incorporates by reference each of the allegations above as if set forth fully herein.

35. Visa and BankIslami entered into the Agreements as set forth above.

36. Visa, its agents, representatives, and/or employees performed all conditions, covenants and promises required of them under the Agreements.

---

[3] Pursuant to a suit for declaration and injunction filed by BankIslami, the High Court of Sindh at Karachi issued an injunction on October 29, 2018 stating that the Faysal Bank account could not be debited. This decision has been appealed to the Supreme Court of Pakistan.

[4] Assessments continue to accrue on a daily basis, and the number provided was current as of January 28, 2020.

37. Pursuant to the Agreements, BankIslami had an obligation to "[n]ot withhold payment because" it "dispute[d] its liability for the payment." BankIslami also had an obligation to "be ready to settle the Transaction within the timeframe specified by Visa."

38. By withholding payment, BankIslami breached its Agreements with Visa.

39. Furthermore, pursuant to the Agreements, BankIslami had an obligation to indemnify Visa.

40. By failing to indemnify Visa, BankIslami breached its Agreements with Visa.

41. As a direct and proximate result of such breaches, Visa has suffered injury and harm in an amount to be proven at trial that exceeds the jurisdictional minimum of this Court.

42. Visa's damages include at least: (1) the principal amount of BankIslami's debt in the amount of $6,207,960.59; plus (2) assessments totaling $7,309,562.00 as of January 28, 2020; and (3) interest in the amount of ten percent (10%) per annum, pursuant to California Civil Code Section 3289(b)[5] from October 29, 2018 until full repayment.[6]

43. Accordingly, Visa is entitled to payment by BankIslami of its $6,207,960.59 principal debt, applicable assessments (totaling $7,309,562.00 as of January 28, 2020), applicable interest (at the rate of ten percent per annum from October 29, 2018), recovery of Visa's attorneys' fees and costs (*see* **Ex. B** § 11.3), and any additional relief that is just and appropriate.

## SECOND CAUSE OF ACTION

### (BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)

44. Visa repeats, re-alleges, and incorporates by reference each of the allegations above as if set forth fully herein.

45. Visa and BankIslami entered into the Agreements as set forth above.

---

[5] The Agreements provide that California law governs. *See* **Ex. A** ¶ 10; **Ex. B** § 8.

[6] California Civil Code Section 3289(b) provides: "If a contract entered into after January 1, 1986 does not stipulate a legal rate of interest, the obligation shall bear interest at a rate of 10 percent per annum after a breach." The Agreements provide that California law governs. *See* **Ex. A** ¶ 10; **Ex. B** § 8. The Agreements do not specify the interest rate, and thus, Section 3289(b) applies.

46. The Agreements between the parties contained an implied covenant of good faith and fair dealing under applicable California law prohibiting each of the parties from actions that would deprive the other party of any of its rights under the terms of the Agreements.

47. Visa, its agents, representatives, and/or employees performed all conditions, covenants and promises required of them under the Agreements.

48. BankIslami violated its duty of good faith and fair dealing under the Agreements by withholding payment and taking actions to deprive Visa of its rights under the terms of the Agreements.

49. BankIslami violated its duty of good faith and fair dealing under the Agreements by failing to indemnify Visa, in accordance with the Agreements.

50. Visa has been damaged by BankIslami's breach of its duty of good faith and fair dealing in an amount to be proven at trial, but not less than $6,207,960.59 for its principal debt, applicable assessments (totaling $7,309,562.00 as of January 28, 2020), and applicable interest (at the rate of ten percent per annum from October 29, 2018 until full repayment).

51. Accordingly, Visa is entitled to payment by BankIslami of its $6,207,960.59 principal debt, applicable assessments (totaling $7,309,562.00 as of January 28, 2020), applicable interest (at the rate of ten percent per annum from October 29, 2018 ), recovery of Visa's attorneys' fees and costs (*see* **Ex. B** § 11.3), and any additional relief that is just and appropriate.

## PRAYER FOR RELIEF

Visa prays for judgment against BankIslami as follows:

1. For damages in the amount of at least $6,207,960.59 in principal debt, and applicable assessments (totaling $7,309,562.00 as of January 28, 2020) pursuant to the Agreements, plus daily interest at the rate of ten percent per annum from October 29, 2018 until the date of full payment;

2. For legal expenses and costs of suit pursuant to the Agreements and applicable law;

3. For attorneys' fees pursuant to the PSA; and

4. For such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff Visa respectfully demands a jury trial on all issues so triable.

Dated: March 13, 2020.                    FARELLA BRAUN + MARTEL LLP

                                          By:   */s/ Roderick M. Thompson*
                                                Roderick M. Thompson

                                          Attorneys for Plaintiff VISA INTERNATIONAL SERVICE ASSOCIATION